1999 UT App 091

**COLONIAL PACIFIC LEASING CORP., Plaintiff and Appellee,**

v.

**J.W.C.J.R. CORPORATION dba Jack's Southwest Collision Repair; and John W. Cumberledge, Jr., Defendants and Appellants.**

No. 980062–CA.

Court of Appeals of Utah.

March 25, 1999.

---

Grant W.P. Morrison and William Patrick Morrison, Morrison & Morrison LC, Salt Lake City, for Appellants.

J. Bruce Reading and Wesley D. Hutchins, Scalley & Reading, Salt Lake City, for Appellee.

Before WILKINS, P.J., and GREENWOOD and BILLINGS, JJ.

## OPINION

BILLINGS, Judge:

¶ 1 Appellants J.W.C.J.R. Corp. (JWCJR) and John W. Cumberledge, Jr. (Cumberledge) appeal a judgment in favor of appellee Colonial Pacific Leasing Corp. (Colonial Pacific), awarding Colonial Pacific the amount due under its finance lease agreement with JWCJR. Because we conclude the trial court's findings of fact are insufficient to support its judgment enforcing the finance lease agreement, we reverse and remand.

## FACTS

¶ 2 JWCJR, an autobody shop, sought a computer and software package that would facilitate the generation of estimates for insurance companies and improve internal shop management. JWCJR was approached by Bottomline Systems, Inc. (Bottomline), who demonstrated a computer and software system. To obtain the demonstrated system, JWCJR entered into a finance lease agreement with Colonial Pacific, the lessor. JWCJR's owner, Cumberledge, signed the lease both as an agent of JWCJR and as a personal guarantor. Colonial Pacific purchased the equipment from Bottomline. Under the finance lease agreement, JWCJR was to make monthly payments to Colonial Pacific.

¶ 3 A few days before JWCJR received the computer and software package from Bottomline, Colonial Pacific required Cumberledge to sign an "acceptance and acknowledgment" form that stated the equipment had been received from Bottomline and was satisfactory. Cumberledge signed the acceptance and acknowledgment form and made an initial lease payment. On the day JWCJR received the equipment, Colonial Pacific contacted Cumberledge seeking a verbal verification that the equipment was acceptable. Cumberledge told Colonial Pacific's representative that JWCJR had received the equipment, but it was not yet operational.

¶ 4 Cumberledge had difficulty getting the computer system to function properly and repeatedly contacted Bottomline with his concerns. On the second day JWCJR had the computer equipment, Colonial Pacific again contacted Cumberledge to inquire whether the system was operational; Cumberledge responded that the system was working. Colonial Pacific then paid Bottomline for the equipment. Later that day the system crashed, and despite repeated calls to Bottomline and many attempts to get it functioning, Cumberledge could not get the system to work.

¶ 5 Soon after, Cumberledge phoned Colonial Pacific and informed it the computer equipment was not functioning and never had functioned properly. Cumberledge boxed up the equipment and contacted Bottomline to pick it up. Within the next few weeks, Cumberledge again phoned Colonial Pacific to tell it of his problems with the computer system and to cancel the lease. From his conversation with a Colonial Pacific representative, Cumberledge believed the lease was canceled and that he was no longer obligated to make lease payments. Colonial Pacific had no record of the telephone calls.

¶ 6 More than two years later, Colonial Pacific sought to recover the unpaid lease payments. JWCJR, and Cumberledge as guarantor of the lease, refused to pay. Colonial Pacific brought this action to recover the full lease amount. The trial judge concluded JWCJR had breached the lease agreement by failing to make the required lease payments and awarded Colonial Pacific a judgment for $21,275.30. JWCJR and Cumberledge now appeal.

## ANALYSIS

### I. Acceptance

■ ¶ 7 On appeal JWCJR argues the trial court erred in enforcing the lease agreement because JWCJR never accepted the goods covered by the lease. JWCJR contends any alleged acceptance took place before it had a reasonable opportunity to inspect the computer equipment.

¶ 8 Under Article 2A of the Uniform Commercial Code (UCC), which governs enforcement of financing leases, we must determine if a lessee has accepted the goods, and therefore, has agreed to the lease. Once a lessee has accepted the goods, the lessee's promises are deemed irrevocable. *See* Utah Code Ann. § 70A–2a407(1) and (2) (1997). Subsections 407(1) and (2), commonly referred to jointly as "the hell or high water provision," state:

> (1) In the case of a finance lease that is not a consumer lease, *the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods.*
>
> (2) A promise that has become irrevocable and independent under Subsection (1):
>
> (a) is effective and enforceable between the parties, and by or against third parties including assignees of the parties; and
>
> (b) is not subject to cancellation, termination, modification, repudiation, excuse, or substitution without the consent of the party to whom the promise runs.

*Id.* (emphasis added.).

¶ 9 Utah Code Ann. § 70A–2a–515 (1) (1997) explains when a lessee has accepted leased goods:

> (1) Acceptance of goods occurs after:
>
> (a) *the lessee has had a reasonable opportunity to inspect the goods and the lessee signifies or acts with respect to*

*the goods in a manner that signifies to the lessor or the supplier that the goods are conforming or that the lessee will take or retain them in spite of their nonconformity;* or

> (b) the lessee fails to make an effective rejection of the goods as provided in Subsection 70A–2a–509(2).

Utah Code Ann. § 70A–2a–515 (1) (1997) (emphasis added).

¶ 10 One commentator further explains acceptance in financing leases:

> Section 2A–515(1) provides that acceptance occurs when the lessee does any of three things *after a reasonable opportunity to inspect the goods:* (a) signifies acceptance; (b) fails to make an effective rejection; or (c) does any act that signifies acceptance. Normally, acceptance occurs under the first test where the lessee, *after inspection,* indicates that the lessee is satisfied with the goods and will take them, or signifies that the lessee will take or retain them notwithstanding their defects.

2A William D. Hawkland & Frederick H. Miller, *Uniform Commercial Code Series* § 2A–515, at 839 (1993) (emphasis added).

¶ 11 Because it is generally accepted that UCC sections 2–606 and 2A–515 are analogous,[1] we look to case law interpreting both provisions to help us determine whether JWCJR had a reasonable opportunity to inspect the computer equipment, and thus by its acts accepted the equipment.

■ ¶ 12 Whether a party has had a "reasonable opportunity to inspect," and thus whether an acceptance has occurred, is a question of fact. *See Figueroa v. Kit–San Co.,* 123 Idaho 149, 845 P.2d 567, 576 (Ct. App.1992) ("What is a reasonable time is primarily a question of fact."); *Sjogren v. Maybrooks, Inc.,* 214 Ill.App.3d 888, 158 Ill. Dec. 182, 573 N.E.2d 1367, 1369 (1991) ("The

---

1. Though this is a financing lease agreement, most commentators agree that UCC § 2A–515 parallels UCC § 2–606, its analogous provision in the sales article. "UCC § 2A–515 parallels the comparable provision of the sales Article [UCC § 2–606] and will be given the same interpretation as that provision." 5 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2A–515:3, at 684 (3d ed.1994); *see also* 2 James J.

White & Robert S. Summers, *Uniform Commercial Code, Practitioners Treatise Series,* §§ 14–1 and –2, at 24–28 (4th ed. 1995) ("Sections 2A–508 through 2A–517 are relatively straightforward modifications of the Article 2 rules on rejection, cure, revocation, acceptance and the like."). Because there is little authority explaining when acceptance occurs under § 2A–515, we also rely on cases discussing section 2–606.

UCC definition of a reasonable time suggests that the question of reasonableness is particularly fact sensitive. It follows that '[w]hether conduct has amounted to an acceptance or a rejection of goods is a question of fact "to be determined within the framework of each particular case."'" (Citations omitted.)); *Capitol Dodge Sales v. Northern Concrete Pipe,* 131 Mich.App. 149, 346 N.W.2d 535, 538–39 (1983) (holding trial court's findings of fact were inadequate to establish whether acceptance had occurred); *Ho v. Wolfe,* 688 S.W.2d 693, 696 (Tex.App.1985) ("[T]he determination of what actions amount to an acceptance or rejection in a particular case is generally made by the trier of fact."); *cf. Lish v. Compton,* 547 P.2d 223, 226–27 (Utah 1976) (stating that determination of what constitutes "reasonable time" for confirmation of sale is usually question of fact).

■ ¶ 13 Taking possession of the goods is not determinative of acceptance, nor is the signing of a form acceptance before receipt of the goods, nor the making of a lease payment. "A 'reasonable time to inspect' under the UCC must allow an opportunity to put the product to its intended use, or for testing to verify its capability to perform as intended." *Capitol Dodge Sales,* 346 N.W.2d at 539; *see also* James J. White & Robert S. Summers, *Hornbook of the Law Under the UCC* § 8–2, at 296 (4th ed. 1995) ("[T]he prevailing view is that one who buys complex goods ... and signs a contract for purchase after only a short [period] should not be held to have had a 'reasonable opportunity to inspect' and therefore not be held to have accepted the goods."). In *Capitol Dodge Sales,* the Michigan Court of Appeals found a trial court's determination that a buyer accepted a new vehicle to be clearly erroneous when the vehicle overheated repeatedly and the buyer later returned the vehicle. *See Capitol Dodge Sales,* 346 N.W.2d at 537–38. The court noted that acceptance under the UCC assumes an act beyond merely taking possession of goods: "Possession during the time necessary for the 'reasonable opportunity' to inspect is contemplated prior to acceptance." *Id.* at 539.

¶ 14 Similarly, in *Moses v. Newman,* 658 S.W.2d 119, 121–22 (Tenn.Ct.App.1983), the Tennessee Court of Appeals held that the buyer of a mobile home had not had a "reasonable opportunity to inspect," and thus, although the buyer had possession of the goods, no acceptance had occurred. "What is a reasonable opportunity varies, depending upon the type of goods involved.... [T]he statute, by affording the purchaser a reasonable opportunity to inspect, implies possession or some possible use by the purchaser without acceptance of the goods." *Id.* at 121 (citations omitted); *see also Jacob Hartz Seed Co., Inc. v. Coleman,* 271 Ark. 756, 612 S.W.2d 91, 92 (1981) ("It is clear that under the [Uniform Commercial] Code, delivery does not in and of itself constitute acceptance."); *Jakowski v. Carole Chevrolet, Inc.,* 180 N.J.Super. 122, 433 A.2d 841, 843 (1981) ("[T]he mere taking of possession by the purchaser is not equivalent to acceptance. Before he can be held to have accepted, a buyer must be afforded a 'reasonable opportunity to inspect' the goods.") (citations omitted).

¶ 15 Additionally, in *Tri–Continental Leasing Corp. v. Law Office of Richard W. Burns,* 710 S.W.2d 604 (Tex.App.1985), the Texas Court of Appeals held there was no acceptance even when a lessee signed an acceptance form acknowledging the equipment was satisfactory and in working order. *See id.* at 608. In reaching its conclusion, the court focused on the lessee's lack of opportunity "to test the working order of the machine" before he was compelled to sign the acknowledgment in finding that there was no "reasonable opportunity to inspect the goods." *Id.; cf. Horrocks v. Westfalia Systemat,* 892 P.2d 14, 16 (Utah Ct.App.1995) (concluding a signed acceptance and acknowledgment form not binding on buyer when form signed before delivery of goods).

¶ 16 Also, in *Tonka Tours, Inc. v. Chadima,* 372 N.W.2d 723 (Minn.1985), the Minnesota Supreme Court held that a buyer had not accepted goods when he was compelled to provide payment before actual receipt of the goods. *See id.* at 727. "When a contract requires payment prior to inspection, payment 'does not constitute an acceptance of goods or impair the buyer's right to inspect

or any of his remedies.'" *Id.* (quoting Minn. Stat. § 336.2–512(2) (1984)).

¶ 17 In this case, the trial judge failed to make findings of fact on the pivotal issue of whether JWCJR had a reasonable opportunity to inspect the computer and software package, or even on the ultimate issue of whether JWCJR accepted the goods. "It is well settled that the trial court should make findings on all material issues tried by the parties, and a failure to do so is generally considered reversible error and requires a remand." *Kinkella v. Baugh,* 660 P.2d 233, 236 (Utah 1983). However, a trial court's decision may "be affirmed if the failure to make the missing findings can be viewed as harmless error." *Hall v. Hall,* 858 P.2d 1018, 1025 (Utah Ct.App.1993). Harmless error can occur two ways: (1) if "'the undisputed evidence clearly establishes the factor or factors on which the findings are missing,'" or (2) "even given controverted evidence . . . if the absent findings can reasonably be implied." *Id.* (quoting *Allred v. Allred,* 797 P.2d 1108, 1111 (Utah Ct.App. 1990)).

¶ 18 "Unstated findings can be implied if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *Hall,* 858 P.2d at 1025. "Findings [of fact] may *not* be implied, however, when the 'ambiguity of the facts' makes such an assumption unreasonable. This court [has] held that we will not imply any missing finding where there is a 'matrix of possible factual findings' and we cannot ascertain the trial court's actual findings." *Id.* at 1025–26 (citations omitted).

¶ 19 In this case, the trial court's failure to make findings on whether JWCJR had a reasonable opportunity to inspect the goods, and thus by its acts accepted the goods, is not harmless error. The first alternative fails because the facts are disputed and are "not capable of supporting only a finding" of acceptance. Cumberledge, on the second day after he received the computer equipment, told Colonial Pacific that the equipment was operational. However, soon after,

Cumberledge made repeated telephone calls to Colonial Pacific telling it that the equipment was inoperative. Cumberledge also testified he was unfamiliar with the computer system and needed assistance in installing the programs and learning how to use the system. Finally, Cumberledge spoke with a representative of Colonial Pacific and understood from this conversation that the lease was canceled.

¶ 20 In contrast, Colonial Pacific relies on the "acceptance and acknowledgment" form, signed by Cumberledge' before the equipment was delivered, to establish acceptance. Further, it claims that to the best of its knowledge the computer and software package were operational, and that Cumberledge never contacted Colonial Pacific in the initial weeks of the lease. The trial court was thus faced with disputed evidence but never made the critical finding that JWCJR, after having a "reasonable opportunity to inspect" the computer equipment, had "accepted it."

¶ 21 Similarly, because it cannot reasonably be implied that JWCJR had a "reasonable time for inspection," and thus accepted the computer and software system, the second alternative for affirming the trial court's ruling also fails. The trial court heard conflicting testimony as to Cumberledge's ability to get the computer and software equipment to function properly. Colonial Pacific contended that only two to three days after the computer equipment's delivery, it contacted Cumberledge to determine if the equipment was operational. Based upon his affirmative answer, Colonial Pacific funded the lease. However, Cumberledge testified the computer system crashed that same day, and that he telephoned Colonial Pacific twice, once soon after the system crashed and again within about ten days of its failure. Both times Cumberledge told Colonial Pacific the equipment was not operating and had never operated properly. Indeed, the trial court's findings of fact suggest that JWCJR did not have a reasonable opportunity to inspect the leased equipment and did not signify acceptance by its acts:

4. The equipment was delivered and installed at Defendant [JWCJR's] place of business by Bottomline Systems, Inc., but it did not function properly.

5. Defendant John Cumberledge informed [Colonial Pacific] on two occasions that the equipment was not operational.

6. The equipment was returned to Bottomline Systems, Inc. subsequent to the signing and execution of the finance lease.

7. [Cumberledge and JWCJR] were not contacted by [Colonial Pacific] until approximately two years thereafter, at which time [Colonial Pacific] sought payment in full from [JWCJR].

¶ 22 In sum, a finding that JWCJR had a reasonable opportunity to inspect the computer equipment, and thus by its actions accepted the equipment, cannot be reasonably implied "where there is a 'matrix of possible factual findings' and we cannot ascertain the trial court's actual findings." *Hall,* 858 P.2d at 1025–26. We conclude the trial court's failure to expressly make the findings of fact whether JWCJR had a reasonable opportunity to inspect the equipment, and whether it signified acceptance of the equipment by its actions, is not harmless error. We therefore reverse and remand for the trial court to consider these critical issues in light of our opinion, and to make the necessary findings to support its conclusion.

## II. Rejection

■ ¶ 23 JWCJR also argues the trial court erred in concluding it breached the lease agreement because JWCJR contends it rejected the computer equipment. The concept of rejection is intertwined with acceptance. "Acceptance of goods occurs after: the lessee fails to make an effective rejection of the goods as provided in Subsection 70A–2a–509(2)." Utah Code Ann. § 70A–2a–515(1)(b) (1997). Section 70A–2a–509(2) explains when a lessee has rejected leased

goods: "Rejection of goods is ineffective unless it is within a reasonable time after tender or delivery of the goods and the lessee seasonably notifies the lessor." Utah Code Ann. § 70A–2a–509(2) (1997).[2]

Assuming the goods do not conform to the lease contract, section 2A–509(2) places the lessee under an affirmative duty to reject them on pain of being deemed to have accepted them.... Because failure to make a proper rejection amounts to an acceptance, section 2A–509(2) is closely related to section 2A–515(1)(b), which deals with acceptance and cross-references section 2A–509(2).

To make an effective rejection, the rejection must occur within a reasonable time after the tender or delivery of the goods. The duration of the reasonable time in which the lessee has the right to reject will vary with the circumstances.... It should be remembered that the lessee has a reasonable opportunity to inspect the goods before the lessee is deemed to have accepted them under section 2A–515(1). *The affirmative duty to reject on pain of being deemed to have accepted does not arise until the time given the lessee to inspect has ended.*

2A Hawkland and Miller § 2A–509:08, at 780–81 (citations and footnotes omitted) (emphasis added).

■ ¶ 24 Accordingly, the factual determination as to whether JWCJR had a reasonable opportunity to inspect the computer equipment must be made before the question of whether JWCJR properly rejected the goods can be answered.[3] Having concluded that the trial court failed to make this critical factual determination, we remand to the trial court to make appropriate findings as to

2. "UCC § 2A–509 restates the substance of UCC § 2–601 and § 2–602(1). The lease provision will be given the same interpretation as the provisions of Article 2." 5 Anderson § 2A–509:3, at 664.

3. Whether a party has rejected goods is a question of fact. *See, e.g., SPS Indus., Inc. v. Atlantic Steel Co.,* 186 Ga.App. 94, 366 S.E.2d 410, 414 (1988) ("Whether a buyer rejected goods within a 'reasonable time after their delivery' and seasonably notified the seller of the rejection is ordinarily a question of fact for determination by

a jury under all the facts and circumstances of the case."); *Continental Concrete Pipe Corp. v. Century Road Builders, Inc.,* 195 Ill.App.3d 1, 142 Ill.Dec. 291, 552 N.E.2d 1032, 1041 (1990) ("It is for the trier of fact to determine whether conduct amounts to acceptance or rejection and whether notice of rejection is reasonable and sufficient."); *Badger Produce Co., Inc. v. Prelude Foods Int'l, Inc.,* 130 Wis.2d 230, 387 N.W.2d 98, 105 (Ct. App.1986) (determining whether party notified seller of rejection "within a reasonable time" is largely question of fact).

whether JWCJR had a reasonable opportunity to inspect the goods, and thus whether JWCJR timely rejected them.[4]

### III. Cancellation

■ ¶ 25 Additionally, JWCJR argues, even assuming the trial court determines it accepted the leased goods, the trial court's conclusion that JWCJR breached the finance lease agreement is nevertheless in error because Colonial Pacific consented to cancel the lease. We note that even the "hell or high water" provision provides a mechanism by which a lessee can escape its harsh strictures. "A promise that has become irrevocable and independent under Subsection (1): is not subject to cancellation, termination, modification, repudiation, excuse, or substitution *without the consent of the party to whom the promise runs.*" Utah Code Ann. § 70A–2a–407(2)(b) (1997) (emphasis added). One commentator has explained what constitutes consent under this section:

> The waiver that is inherent in the independence-irrevocability concept of UCC § 2A–407 is itself declared to be irrevocable. The Code declares that the lessee cannot be released from the consequence of the lessee's acceptance of goods "without the consent of the party to whom the promise (that has become irrevocable and independent) runs." It is specifically stated that it "is not subject to cancellation, termination, modification, repudiation, excuse, or substitution" without such consent.
>
> Nothing is stated as to the form or content of the consent. It is to be concluded that the consent may be oral and may be established by conduct that reasonably manifests an intent to consent. With respect to the content of the consent, it is not necessary that reference be specifically made to UCC § 2A–407. Any manifestations that the obligation of the lessee will not be enforced independently of the obligation that runs to the consenting party is sufficient.

5 Anderson § 2A–407:7, at 607 (footnote omitted).

¶ 26 Though we have not found any case law to help us determine when a lessor consents to the cancellation of a lease,[5] this question is comparable to whether parties have agreed to an oral modification of a lease. In *Richard Barton Enterprises, Inc. v. Tsern,* 928 P.2d 368 (Utah 1996), our supreme court explained a prerequisite for a contract or lease modification. "A valid modification of a contract or lease requires 'a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness.'" *Id.* at 373 (quoting *Valcarce v. Bitters,* 12 Utah 2d 61, 63, 362 P.2d 427, 428–29 (1961)) (additional citation omitted); *accord Fisher v. Fisher,* 907 P.2d 1172, 1177 (Utah Ct.App.1995) (same); *see also Dennett v. Kuenzli,* 130 Idaho 21, 936 P.2d 219, 224 (Ct.App.1997) (stating modification of an agreement " 'may be implied from a course of conduct in accordance with its existence and assent may be implied from the acts of one party in accordance with the terms of the change proposed by the other' " (citation omitted)).

■ ¶ 27 Further, the question of whether an "oral modification has been proven is one for the trier of fact." *Kuenzli,* 936 P.2d at 224; *see also Fair v. Red Lion Inn,* 920 P.2d 820, 825 (Colo.Ct.App.1995) ("Whether the parties have modified or amended a previously existing contract is ... question of fact."); *Wolin v. Walker,* 830 P.2d 429, 432 (Wyo.1992) ("The question of whether the alleged modification of the written agreement has been proved by the required quantum of evidence is one to be decided by the trier of fact.").

¶ 28 In this case, the trial court made findings of fact regarding Cumberledge's two telephone calls to Colonial Pacific:

> 5. Defendant John Cumberledge informed [Colonial Pacific] on two occasions that the equipment was not operational.
> . . . .

---

**4.** The determination of whether a rejection occurred also, necessarily, involves the question of whether the computer and software package were nonconforming goods. *See* Utah Code Ann. § 70A–2a–509 (1)(1997).

**5.** UCC § 2A–407 does not have an analogous provision in the sales article, thus we cannot look to the sales article for guidance.

7. The Defendants were not contacted by [Colonial Pacific] until approximately two years thereafter, at which time [Colonial Pacific] sought payment in full from Defendants.

Additionally, the trial court's ruling from the bench [6] acknowledges Cumberledge's understanding that the lease was canceled after the second conversation:

Five: Mr. Cumberledge contacted Colonial Pacific Leasing and advised them of the problem. Two to three weeks later, he contacted Colonial again and advised them of the problem. *He was under the impression that if he didn't hear from Colonial, everything was okay regarding the lease.*
Six: Mr. Cumberledge did not hear from Colonial for about two years when it initiated this case against the corporation and himself for failing to make the payments on the lease.

(Emphasis added.)

¶ 29 The trial court's findings of fact and conclusions of law fail to make the critical determination as to whether Colonial Pacific consented to cancel the finance lease agreement. As we have noted above, absent adequate factual findings, the question is whether "the failure to make the missing findings can be viewed as harmless error." *Hall*, 858 P.2d at 1025.

¶ 30 We conclude the trial court's failure to determine whether Colonial Pacific consented to cancel the lease is not harmless error. Though the trial court found that Cumberledge made two telephone calls to Colonial Pacific concerning the problems he was having with the equipment, and that Cumberledge believed the lease was effectively canceled after the second telephone conversation, it made no findings concerning Colonial Pacific's refusal to cancel the lease. Cumberledge testified that he expected to be invoiced or to receive payment books on a monthly basis, and that he took the absence of such invoices and contact from Colonial

Pacific as further evidence the lease was canceled.

¶ 31 In opposition, a Colonial Pacific representative testified to the following: that Colonial Pacific had no record of Cumberledge's telephone calls; that Colonial Pacific was under no obligation to send Cumberledge payment books or invoices; and that because Colonial Pacific switched computer systems, JWCJR's lease "fell through the cracks," and this accounted for the two year lapse in its pursuit of lease payments. The trial court was thus faced with disputed evidence on whether Colonial Pacific consented to cancel its finance lease, but never made the critical finding on consent.

¶ 32 Also, because it cannot be reasonably implied that Colonial Pacific did not consent to the cancellation of the lease, the second alternative for affirming the trial court's ruling as harmless error also fails. We thus remand for the trial court to make the necessary finding of fact on whether Colonial Pacific consented to cancel the finance lease.

## IV. Condition Precedent

¶ 33 Finally, JWCJR contends the trial court should not have enforced the finance lease because a condition precedent to the legal effectiveness of the lease, a thirty-day inspection period for the computer and software package, was not satisfied. We disagree. Although not necessary to our disposition, we reach this issue to aid the trial court on remand.

¶ 34 The official code comment to UCC § 2A–103(1)(g) explains the relationship between a lessor and lessee in a finance lease agreement:

A finance lease is the product of a three party transaction. The supplier manufactures or supplies the goods pursuant to the lessee's specification, perhaps even pursuant to a purchase order, sales agreement

---

**6.** "In assessing the sufficiency of the findings ... we are not confined to the contents of a particular document entitled 'Findings;' rather, the findings may be expressed orally from the bench or contained in other documents." *Erwin v. Erwin*, 773 P.2d 847, 849 (Utah Ct.App.1989) (footnote omitted). Though we refer to the trial court's ruling from the bench for clarification, we note that "[f]indings of fact filed subsequent to the judgment are controlling if any conflict exists with the recitation of the judgment. When an inconsistency exists, express written findings will supersede informal remarks made from the bench." 75B Am.Jur.2d *Trial* § 1982 (1992).

or lease agreement between the supplier and the lessee.... *Due to the limited function usually performed by the lessor, the lessee looks almost entirely to the supplier for representations, covenants and warranties.*

5 Anderson § 2A–103:1(g), at 327 (emphasis added). Further, a New York court recently commented on the relationship between lessors, suppliers, and lessees:

> In a finance lease, the lessee negotiates directly with the supplier or manufacturer and then arranges for the lessor to buy the goods to lease them to the lessee. The lessor is not really an ordinary buyer from the supplier or manufacturer, since it had no part in the selection of the goods. The transaction between the lessor and lessee is therefore first and last a financial transaction. *In such a situation it makes no sense to treat the lessor as a seller with warranty liability* to the lessee, nor to free the supplier or manufacturer from the promises that it would have made in an outright sale to the lessee.

*General Elec. Capital Corp. v. National Tractor Trailer Sch., Inc.,* 175 Misc.2d 20, 667 N.Y.S.2d 614, 618–19 (N.Y.Sup.Ct.1997) (emphasis added) (citing James J. White & Robert S. Summers, *Uniform Commercial Code* § 13.3 (4th ed.1995)); *see also Emlee Equip. Leasing Corp. v. Waterbury Transmission Inc.,* 31 Conn.App. 455, 626 A.2d 307, 313 (1993) ("Because the finance lessor is strictly a financing entity, the lessee ordinarily must look to [the supplier] for warranty liability.").

¶ 35 On cross-examination, Cumberledge testified that it was Bottomline which promised a thirty-day trial period. There was no representation of a thirty-day inspection period in the finance lease agreement.

¶ 36 We conclude Colonial Pacific is not bound by Bottomline's offer of a thirty-day inspection period. Thus, JWCJR's argument that Colonial Pacific failed to satisfy a condition precedent to the enforcement of the finance lease fails.[7]

7. We do not award attorney fees to Colonial Pacific on appeal as it is not the prevailing party.

## CONCLUSION

¶ 37 In sum, we direct the trial court to consider the legal authority we have discussed, review the record, and determine if it can make additional findings of fact in three critical areas: (1) Did JWCJR have a reasonable time to inspect the computer and software package and thus by its acts accept the leased goods; (2) did JWCJR timely reject the computer equipment; and (3) even if JWCJR accepted the leased goods, did Colonial Pacific consent to cancel the finance lease? The trial court may, at its discretion, take additional evidence to determine these highly fact-sensitive issues. Finally, we also conclude that the thirty-day inspection period offered by Bottomline did not bind Colonial Pacific, and thus was not a condition precedent to enforcing the finance lease. We reverse and remand for proceedings consistent with this opinion. Judith M. Billings, Judge

¶ 38 WE CONCUR: MICHAEL J. WILKINS, Presiding Judge, and PAMELA T. GREENWOOD, Associate Presiding Judge.

