2004 OK CIV APP 61

**O.C.T. EQUIPMENT, INC., an Oklahoma corporation, Plaintiff/Appellee,**

v.

**SHEPHERD MACHINERY CO., a foreign corporation, Defendant/Appellant,**

and

Caterpillar Redistribution Systems, Inc., a foreign corporation,[1] Defendant.

No. 100,418.

Court of Civil Appeals of Oklahoma, Division No. 1.

June 18, 2004.

G. Neal Rogers, Dunlap, Codding & Rogers, P.C., Oklahoma City, OK, for Plaintiff/Appellee.

David A. Cheek, A. Michelle Campney, McKinney & Stringer, P.C., Oklahoma City, OK, for Defendant/Appellant.

KENNETH L. BUETTNER, Presiding Judge.

¶1 Defendant/Appellant Shepherd Machinery Co. (Shepherd) appeals from summary judgment granted in favor of Plaintiff/Appellee O.C.T. Equipment, Inc. (O.C.T.). A tractor which O.C.T. agreed to buy from Shepherd was damaged while in the possession of a bailee. The damage occurred before the bailee had acknowledged O.C.T.'s right to possession and before the tractor was made ready for delivery. We find the undisputed facts show that the risk of loss remained on Shepherd at the time the tractor was damaged. We therefore affirm summary judg-

---

1. The claim against Defendant Caterpillar Redistribution Systems, Inc. (Caterpillar) was dis- | missed without prejudice on motion of O.C.T. in an order filed December 15, 2000.

ment directing Shepherd to refund the purchase price to O.C.T.

¶ 2 After the tractor was damaged, O.C.T. refused delivery and sought reimbursement of the $42,000 it had paid for the tractor. Shepherd refused to refund the purchase price. O.C.T. then filed its Petition alleging that Shepherd breached the contract. O.C.T. sought recision of the contract as well as damages and attorney fees. In its Answer, Shepherd asserted that it was not liable because at the time the tractor was damaged, the risk of loss had passed to O.T.C.

¶ 3 The parties' primary dispute was who bore the risk of loss at the time the tractor was damaged. O.C.T. also argued that it had a right to reject nonconforming goods regardless of the risk of loss, but as will be explained, ultimately the issue is resolved under the risk of loss provisions of the Uniform Commercial Code. The trial court found in favor of O.C.T. and awarded $42,500, the price O.C.T. had paid Shepherd for the tractor.

¶ 4 The parties' competing motions for summary judgment, along with responses and replies, show no dispute of material fact. The parties do not dispute that O.C.T. sought to purchase tractors from Caterpillar, which directed O.C.T. to Shepherd. Mike Clark of O.C.T. called Shepherd December 14, 1998 to inquire about tractors then owned by Caterpillar.[2] Shepherd's employee David Solem met Clark at the Keen Transport yard in Santa Paula, California on December 16, 1998. A Keen employee showed the tractors to Clark. Clark agreed at that time to purchase four tractors, including the tractor which is the subject of this suit, serial number JAK0012531. The invoice for the tractors indicated that each would be equipped with EROPS, pat blade, and winch.[3] A fifth tractor was later added to the order and its serial number was hand-written on the invoice. The parties do not dispute that at the time Clark agreed to buy the tractors, trac-

tor JAK0012531 did not have a winch installed and that it was agreed the winch would be installed before delivery. Although it is not included in the written invoice, the parties do not dispute that they also agreed that the tractors would be painted yellow before delivery.

¶ 5 Shepherd faxed the invoice to O.C.T. and O.C.T. wired payment for the tractors to Shepherd December 22, 1998. The tractors remained at Keen from the time Clark viewed them and agreed to purchase them. Shepherd sent instructions to Keen not to release any of the tractors to O.C.T.'s carrier until Keen had received a bill of lading for each tractor and a verbal release from one of two Shepherd employees. Shepherd sent O.C.T. a fax dated December 23, 1998 which stated that four of the tractors, including tractor JAK0012531, would be ready for pickup December 28, 1998. Shepherd does not dispute that on December 21, 1998, O.C.T. contacted Shepherd to ask that each of the tractors be checked for antifreeze levels, because of O.C.T.'s concern about the tractors going through high elevations en route to Oklahoma. Shepherd employee Solem contacted Keen and asked for the antifreeze readings. Keen sent Shepherd a listing of the tractor serial numbers showing the antifreeze readings for all the tractors O.C.T. had agreed to buy, but the list showed that tractor JAK0012531 had no antifreeze reading. Solem called Keen December 28, 1998 and asked Keen to recheck tractor JAK0012531 for antifreeze.

¶ 6 A bill of lading in the record shows that tractor JAKOO12598 was picked up by O.C.T.'s carrier at Keen December 30, 1998. Keen contacted Shepherd December 31, 1998 to inform Shepherd that during the night between December 30 and December 31, 1998, a security guard at Keen had driven tractor JAK0012531. At the time the security guard drove tractor JAK0012531, it had no antifreeze/coolant in it and the engine was burned up and ruined.[4] Shepherd then

---

2. Caterpillar sold the tractors to Shepherd for resale to O.C.T.

3. The invoice is stamped with the words "as is where is" and Shepherd also argued that such language absolved it of responsibility. Those words apply to any warranty on the goods; they

do not alter the risk of loss provisions of the U.C.C.

4. As explained in a letter from Shepherd to O.C.T.'s counsel dated April 26, 1999, "the machine in question needed to have antifreeze added. Unfortunately, before it was added, an inter-

called O.C.T. December 31, 1998 to inform O.C.T. of the damage to tractor JAK0012531. Solem indicated that at that time he also informed O.C.T. that O.C.T. owned tractor JAK0012531 and would have to work with Keen to resolve the damage. O.C.T. refused to take delivery of the damaged tractor.[5] After Shepherd and O.C.T. could not agree on who bore the risk of loss to the tractor, and Shepherd refused to refund O.C.T.'s payment for the tractor, O.C.T. filed its Petition.

¶ 7 The UCC provision pertinent to this case is 12A O.S.2001 § 2–509(2). That subsection provides:

§ 2–509 Risk of Loss in the Absence of Breach

* * *

(2) Where the goods are held by a bailee to be delivered without being moved, the risk of loss passes to the buyer

(a) on his receipt of a negotiable document of title covering the goods; or

(b) on acknowledgment by the bailee of the buyer's right to possession of the goods; or

(c) after his receipt of a nonnegotiable document of title or other written direction to deliver, as provided in subsection 4(b) of Section 2–503.[6]

¶ 8 Shepherd asserts that § 2–509(2)(b) is applicable to this case and that its application requires a finding that O.C.T. bore the risk of loss at the time of the damage. Shepherd's primary contention is that Shepherd, the seller, acknowledged to Keen, the bailee, that O.C.T., the buyer, had the right to possession of the tractors and that § 2–509(2)(b) was therefore met in this case and the risk of loss had transferred to O.C.T. at the time tractor JAK0012531 was damaged. We note the evidence shows only that Shepherd informed Keen in writing that a bill of lading and verbal release (from Shepherd) were required before delivery of each tractor to O.C.T.'s carrier. More importantly, however, it is immaterial what Shepherd communicated to Keen. The plain language of § 2–509(2)(b) requires acknowledgment *by the bailee* of the buyer's right to possession.

¶ 9 Judge Posner, writing for the Seventh Circuit Court of Appeals, has explained that under § 2–509(2)(b), even acknowledgment by the bailee, but only to the seller, is insufficient to transfer the risk of loss. See *Jason's Foods, Inc. v. Peter Eckrich & Sons, Inc.*, 774 F.2d 214 (7th Cir.1985). In *Jason's Foods,* Jason's Foods agreed to sell to Eckrich 38,000 pounds of ribs. The ribs were stored by a bailee—an independent meat storage facility. Under the sales agreement, delivery would be made by transferring the ribs from Jason's account ledger at the storage facility to Eckrich's account at the facility, without moving the ribs. Jason's asked the storage facility to move the ribs from Jason's account to Eckrich's. The facility clerk noted the transfer on the books immediately. Eckrich did not receive a receipt, and did not know the transfer had been made until 11 days later. In the meantime, the ribs were destroyed by a fire at the storage facility. The parties disputed when the risk of loss transferred. Jason's contended the risk transferred to Eckrich on the date the clerk transferred the ribs to Eckrich's account, because on that date Jason's lost ownership and control over the ribs. Eckrich argued that it should not bear the risk of loss of ribs it did not know it owned or controlled.

---

vention by a third party caused the damage in question."

5. Bills of lading in the record show that O.C.T. took possession of the other tractors in the agreement.

6. Section 2–503(4)(b) provides for the manner of tender of delivery and provides:

(4) Where goods are in the possession of a bailee and are to be delivered without being moved
* * *

(b) tender to the buyer of a nonnegotiable document of title or of a written direction to the bailee to deliver is sufficient tender unless the buyer seasonably objects, and receipt by the bailee of notification of the buyer's rights fixes those rights as against the bailee and all third persons; but risk of loss of the goods and of any failure by the bailee to honor the nonnegotiable document of title or to obey the direction remains on the seller until the buyer has had a reasonable time to present the document or direction, and a refusal by the bailee to honor the document or to obey the direction defeats the tender.

¶ 10 The court explained that under § 2–509(2), risk of loss is not related to title, but rather shifts when the transfer is acknowledged. *Id.* at 217. The court then considered to whom the statute required acknowledgment be made. Judge Posner opined that there would be little purpose in acknowledging to the seller the buyer's right to possession, particularly because the seller has informed the bailee of the buyer's right to possession and necessarily already has such knowledge. *Id.* The court noted that § 2–503(4)(a) also indicates that acknowledgment by the bailee of the buyer's right to possession is a method of tendering goods sold without being moved. But, that section likewise fails to indicate to whom the bailee must make the acknowledgment. *Id.* The court noted, however, that the corresponding provision of the Uniform Sales Act, which preceded the UCC, provided that acknowledgment must be made to the buyer, and the UCC comments following § 2–503 state that the section was not intended to change the Uniform Sales Act provision. *Id.* Additionally, the court noted that the comments to § 2–509 indicate that in the circumstance of delivery without moving goods in the possession of a bailee, the rules on manner of tender apply on the issue of risk of loss. *Id.* The court deduced that acknowledgment by the bailee to the buyer is required for tender, and likewise for transfer of the risk of loss. *Id.* The court noted that the acknowledgment need not be in writing, and the court declined to answer whether the pertinent date is when a written acknowledgment is mailed or when it is received, because it found that issue had not been raised by the parties. *Id.* at 218.

¶ 11 We find the reasoning in *Jason's Foods* persuasive. And, the case on which Shepherd relies does not suggest another holding. In *Whately v. Tetrault*, 29 Mass. App. Dec. 112, 5 UCC Rep. Serv. 838 (1964), the plaintiff owned a boat and trailer which were kept in a storage facility. The defendant's agent met with the plaintiff and agreed to purchase the boat and trailer on behalf of the defendant. The agent and the plaintiff then went together to the storage facility where the plaintiff explained to the clerk that the boat and trailer had been sold and told him the agent could arrange to pick up the boat and trailer. The agent and clerk at that time agreed to have the boat and trailer picked up the following day. When the defendant went to the bailee's facility the next day as agreed, the trailer was missing.

¶ 12 The dispute in *Whately* was over who bore the risk of the loss of the trailer. The court found that the bailee had acknowledged the defendant's right to possession of the trailer to the defendant's agent when the two arranged for the time to pick up the boat and trailer. *Id.* at 840. The court also held that because of the acknowledgment by the bailee, there had been a tender of delivery under § 2–503(4)(a). *Id.* The court found that nothing remained for the plaintiff seller to do under the agreement because he had been paid, he had informed the bailee of the sale, and the bailee had acknowledged to the defendant buyer his right to possession of the trailer. The court concluded that the risk of loss therefore had transferred to the buyer at the time of the loss. *Id.* We agree that acknowledgment from the bailee to the buyer is required by § 2–509(2)(b) to transfer the risk of loss to the buyer in the case of goods in the possession of the bailee held to be delivered without being moved.

¶ 13 In anticipation of this interpretation of the statute, Shepherd argued in its Reply to O.C.T.'s Response to Shepherd's Motion for Summary Judgment that Keen had communicated to O.C.T. about O.C.T.'s carrier picking up the tractors. The record contains no evidence to support this assertion. The record contains no bill of lading for tractor JAK0012531. We recognize the Seventh Circuit's holding that an acknowledgment is not required to be in writing, but the record contains no evidence that Keen ever gave O.C.T. verbal or written acknowledgment that O.C.T. had the right to possession of tractor JAK0012531. Indeed, Solem's affidavit makes clear that all communications from Keen were made to Solem at Shepherd, who then passed the information on to O.C.T. Solem's affidavit indicates these communications regarded the coolant readings and then the damage to the tractor; nothing in Solem's affidavit purports to show that Keen acknowledged O.C.T.'s right to possession by communication passed via Shepherd, even if

such indirect acknowledgment could operate to transfer the risk of loss.

■ ¶ 14 Shepherd's argument, that its release of a different tractor, which O.C.T. picked up December 30, 1998, somehow operated as an acknowledgment by Keen to O.C.T. of O.C.T.'s right to possession of *all* of the tractors at that time, is unsupported. Particularly where the undisputed evidence shows that tractor JAK0012531 was not in fact ready for pick up according to the parties' agreement because coolant had not been added to it. O.C.T. employee Clark's affidavit states that *Shepherd informed O.C.T.* on December 23, 1998 that tractor JAK0012531 would be ready for transport December 28, 1998 and that O.C.T. arranged for transport of the equipment for December 30, 1998. However, tractor JAK0012531 was in fact not ready for transport on December 28 or December 30, 1998, because it did not have coolant in it. Solem's affidavit shows that Shepherd continued to direct Keen's actions toward tractor JAK0012531, particularly directing Keen to check the coolant level in the tractor, at the time it was damaged. This fact is important because of the written evidence that Shepherd directed Keen not to release the tractors without a bill of lading and verbal release. It is unreasonable to assume that Shepherd would have given the verbal release of tractor JAK0012531 when Shepherd was still directing Keen to make checks and repairs to that tractor, and which clearly were not completed at the time of the damage. Additionally, it would be unreasonable to say that a bailee could make an acknowledgment and effectively pass the risk of loss before the object of the agreement is conforming. The record contains no legitimate evidence that Keen gave O.C.T. acknowledgment of its right to possession of the tractors as required by § 2–509(2)(b).

■ ¶ 15 Similarly, we dispense with Shepherd's contention that O.C.T. owned the tractor at the time of the damage because O.C.T. inspected the tractors December 16 and mailed payment before the damage occurred. O.C.T. asserts that § 2–513 provides that a buyer has a right before payment or acceptance to inspect the goods. Shepherd contends that this allows but one inspection

*either* before payment or before acceptance, and that O.C.T. inspected the goods when it agreed to purchase them. Shepherd's contention ignores the language of § 2–512(2) that payment does not constitute an acceptance of goods or impair the buyer's right to inspect or any other buyer's remedy. It is undisputed that when O.C.T.'s representative looked at the tractors December 16 (which Shepherd refers to as an inspection), the parties then agreed that Shepherd would make several changes to the tractors before delivery. It is unreasonable to assert that if Shepherd had failed to install the winch or had failed to paint the tractors, O.C.T. would still have been forced to accept delivery of the non-conforming tractors. More importantly, we rely, as the courts in *Jason's Foods* and *Whately* did, on § 2–503 regarding time of tender of delivery in the case of goods held by a bailee for delivery without being moved. That section requires acknowledgment from the bailee to the buyer of the buyer's right to possession before tender of delivery can be found.

¶ 16 The case of *Moses v. Newman,* 658 S.W.2d 119, 37 UCC Rep. Serv. 461 (Tenn. App.1983) is not a bailment case, but it does offer instructive analysis on risk of loss where the goods have not been made conforming at the time of the loss. In *Moses,* the buyer agreed to purchase a habitable mobile home, including installation, from the seller. The seller delivered the mobile home to the buyer's property and began installation. The buyer began cleaning the interior of the home during the installation. The buyer informed the seller that date that two broken parts had been discovered, and also that the buyer did not have keys to the door of the home. The next day, before those conditions were remedied, the home was destroyed by wind. The dispute was whether the buyer had accepted the home at the time of the damage. The court noted that the seller had not completed the contracted installation at the time of the loss. *Id.* at 121. The court held that the buyer's opportunities to inspect the home either at the seller's lot or during the installation were not reasonable opportunities to inspect under the U.C.C. *Id.* The court also noted that § 2–510

provides that where a tender or delivery so fails to conform to the contract as to give a right of rejection, the risk of loss remains on the seller until cure or acceptance. *Id.* at 122. The court noted that the buyer had contracted for a habitable mobile home plus installation. The court found that because the loss occurred before installation was complete, the seller had not delivered conforming goods and the risk of loss remained on the seller. *Id.* The buyer retained the right to reject the goods because they failed to conform. *Id.*, citing § 2–601.

¶ 17 In this case, there is no evidence that Keen gave the acknowledgment to O.C.T. of its right to possess the goods. Additionally, the parties do not dispute that Shepherd retained control over the tractor and agreed to verify that the tractor had coolant in it. The tractor was damaged before the coolant was added. The risk of loss remained on Shepherd in both respects: either under § 2–509(2)(b) because of lack of acknowledg-ment, or under § 2–510(1) because of failure to tender a conforming good before the damage occurred. Under 12A O.S.2001 § 2–601(c), O.C.T. was able to reject only tractor JAK0012531, which was a separable commercial unit. We find the undisputed evidence shows that the risk of loss remained on Shepherd at the time tractor JAK0012531 was damaged and O.C.T. rightfully rejected delivery of it. The trial court's grant of summary judgment to O.C.T. was proper, and the award of the amount paid for the tractor was proper under 12A O.S.2001 § 2–711(1).

AFFIRMED.

ADAMS, J., and JONES, J., concur.